JOHN MARTIN ET AL. V. E. A. WAYMAN ET AL.

1. Where an appeal is taken in a case of trespass to try title, and such appeal is dismissed, limitation runs from the date of the judgment in the District Court, and suit must be brought within one year thereafter, or the judgment becomes conclusive.
2. If such final judgment be rendered during the minority of the plaintiffs, then limitation runs from the removal of such disability, by marriage of a female, or majority.
3. Different disabilities cannot be tacked to prolong such exemption.
4. The act of the Legislature of the tenth of February, 1852 (Paschal's Digest, 4461), relinquishing all the right and interest of the State "in the following described lands to the original grantees thereof, their heirs, and legal assignees," conveyed no title other than a confirmation of the original titles.

APPEAL from Cameron. Tried below before the Hon. Wm. H. Russell.

This case was before the Supreme Court at its Galveston Term, 1863. (26 Texas, 460.)

To the former case we refer for statement, and to the opinion of the court.

*Powers & Maxan*, for appellants.—The defendants say the amendments embrace new matter, etc., and set up a new cause of action. This is not so; the record shows that this same defense was raised upon the former trial of the case. Besides, this suit was brought on the basis of the title acquired by the effect of the confirmation of the Espiritu Santo grant. That at the time of that grant the plaintiffs were not barred of any of their rights, and having the benefit of that grant by and from the State, they could use their own discretion in suing upon it.

In other words, the plaintiffs sue on an after-acquired title by force of the said confirmation.

In this respect they invoke the principles decided by the Supreme Court of the United States, in Strother v. Lucas,

12 Peters, 441 and 454 (top), wherein it is laid down, "That a grant may be made by a law, as well as a patent pursuant to a law, is undoubted (6 Cr., 128); and a confirmation by a law is as fully, to all intents and purposes, a grant, as if it contained in terms a grant *de novo*."

Now, what was the condition of things which the State of Texas sought to obviate and to establish in these confirmations? She had just brought within her fold an immense district of country, of which, in its social and material interest, she knew nothing. She was anxious, so far as possible, to render homogeneous with the balance of the State these elements; to pacify and allay the fears and apprehensions of its people; and, in a word, to cement them in their every relation into one common brotherhood. One of its first measures was to provide a board for the investigation of land titles. (Paschal's Digest, Arts. 4440 to 4455.)

This duty was performed, and the result is contained in Paschal's Digest, Articles 4459 to 4465.

There are many reasons for these provisions; not the least among them was the fact that this people had been brought violently under the political and civil jurisdiction of Texas, from a system of government and laws different from that of the parent State; the courts had to be general and uniform in the administration of justice; and a knowledge of the land titles, as well as the tenure, had to be acquired. These provisions accomplished all this.

Texas had, since December, 1836, claimed the jurisdiction she is now exercising; of course she had to pass upon what had occurred locally in this interval. The laws and government of Mexico had their limitations and restrictions in the tenure of property, as well as did those of the Republic and State of Texas. The two former were particularly onerous toward aliens. The Legislature was desirous of legalizing the actual tenures as a measure

of simple and common justice.   By these general confir-
mations they did this.   In order to secure justice in this
respect they adopted the *status* of persons and things as
they had stood under the Mexican *regime;* in this way
no injustice or violence was perpetrated on any man's
rights, and the transition of authority and allegiance thus
effected was peaceful and happy.

Now then, with these premises, under the confirmation,
did not the position of plaintiffs, as legal assignees under
this grant, remain unchanged?   Did the Legislature do
an idle thing in this confirmation, or has it changed, in
any respect, the rights of the defendants?   In no sense of
the word are, or were, they legal assigns, nor do they so
pretend.

The plaintiffs show in what way they are legal assigns
under this grant; they allege that their ancestor, by the
judgment of a Mexican court of competent jurisdiction,
acquired the property in question; that he bid it in, and
was placed in judicial possession.   Now no objection is
urged against the jurisdiction of that court, nor other im-
pediment alleged.   Indeed, the jurisdiction is affirmed by
this court in several adjudged cases.   (See Martin v.
Wayman, 26 Texas, 460; Trevino v. Fernandez, 13 Texas,
630.)

In the case above cited (Strother v. Lucas, 12 Peters,
437), the court says: "No principle can be better estab-
lished by the authority of this court than that the acts of
an officer to whom a public duty is assigned by his king,
within the sphere of that duty, are *prima facia* taken to
be within his power," etc.   And further: "The same
rule applies to the judicial proceedings of local officers
to pass the title of land, according to the course and
practice of the Spanish law in that province."   (8 Peters,
310.)   "Where the act done is contrary to the written or-
der of the king, produced at the trial, and without any

explanation, it shall be presumed that the power has not been exceeded; that the act was done on the motives set out therein, and according to some order known to the king and his officers, though not to his subjects."

These principles point out only some of the motives for upholding the solemn adjudications of courts of justice in the exercise of their common jurisdiction. In this regard the English and American doctrine is the same; the record perforce is made to imply "absolute verity."

We consider, then, that by the adjudication of the Mexican court, Robert Gilmore took what the court gave him, the legal title to the land in question; that, as such, he was a legal assign, and transmitted this quality to his daughters, the plaintiffs, and that they, in virtue of this, are beneficiaries under the confirmation as the foundation of this suit. (Stoddard *et al.* v. Chambers, 2 How., 284; Massey *et al.* v. Papin, 24 Howard, 362.)

The ground of objection to the plaintiffs' amended petition that we are now considering is, that while the plaintiffs claim or deraign title from John Stryker, they impeach his title and capacity to hold.

This is not so. We simply assert that in no sense can the defendants show themselves to be the legal assigns of this land, and we instance as one reason therefor that said Stryker could not impart to them a title, neither by the laws of Mexico, nor by those of the Republic of Texas, by reason of alienage; for by the laws of neither of these States could aliens acquire and hold real estate at the period herein involved. (Clay v. Clay, 26 Texas, 24.) He lacked, therefore, the capacity to transmit such estate.

At most and at best the interest held by Stryker in this land was defeasible; the proof of this is that the court condemned and sold it. Now it is a principle of the English law, in cases where aliens hold the title to real

estate, in order to avoid a confiscation or escheat, to treat such estate as a trust interest, and not as a fee, and so allow the party the benefit of its proceeds. But will any one pretend that such an owner of the fee in England could transmit it to his heirs? By no means ; and in this sense was the allegation in the amended petition, and no more.

We consider that we have sufficiently examined the pleadings and the rulings of the court in this case to show that the court erred in sustaining defendants' objections to the plaintiffs' amended petition, and that such ruling should be reversed.

Now, as to the order of the court in dismissing the suit in passing on the defendants' exceptions, without putting the defendants to their proof, we consider that the court also erred. The unbroken current of the decisions of this court is to the effect of *respondeat ouster* in judgments on demurrer, unless the party declines further to plead or amend. (See Cook v. Crawford, 1 Texas, 9 ; Perry v. Rice, 10 Texas, 367 ; Jennings v. Moss, 4 Texas, 452 ; Portis v. Hill, 3 Texas, 273 ; Sasser v. Davis, 27 Texas, 657 ; Thompson v. Eanes, 32 Texas, 190.)

*Hancock & West*, for appellees.

WALKER, J.—In our discussion of this case we will reverse the order in which counsel present the different points raised upon the record.

As to the act of February 10, 1852 (Paschal's Digest, 4461), we cannot see how that act could affect the rights of the parties to this suit. It was simply intended to relinquish all the right and interest of the State (if it had any), to Jose Salvador de la Garza, in 59½ leagues of land known as El Espiritu Santo grant.

It did not, in our judgment, in any way affect the legal

status of the parties to this suit, and the judgment of the District Court to this effect we think correct.

This case was once before passed upon by this court, and from this circumstance arises the most difficult questions herein to be determined. None of the questions involved in the former case are presented; but the submission of the record, in No. 988, led to some confusion, and the labor of writing an opinion predicated solely upon the issues presented in that case. We can only look upon this as labor lost, and we now address ourselves to the points involved in this case.

The suit appears to have been filed on the tenth of March, 1855. On the eighth of August, 1871, the appellees, defendants below, filed an amended answer, setting up the plea of *res judicata;* also, that the former adjudication was upon the merits, and that the present action was barred by limitation.

The plaintiffs below filed special exceptions, and, without waiting for a judgment of the court on these exceptions, the appellees filed a plea in avoidance, setting up the removal of the appellants' disability of minority, and averring that the statute of limitations was a bar to this suit.

The appellants again excepted, and the court overruled the exception. This was followed by an amended petition, setting up the act of the tenth of February, 1852, as a source of title to the appellants. (Paschal's Digest, 4461.) To this petition the defendants demurred. The demurrer was sustained, and the plaintiffs not asking to amend, the judgment was rendered for the appellees, from which this appeal has been taken.

We must now, in order to test the correctness of the rulings of the court, examine into some of the facts of the case. In the former suit, we think undoubtedly, there was a trial upon the merits before a jury, who re-

turned their verdict for the appellees, and the judgment followed.

This trial appears to have taken place on the eleventh of October, 1849.

An appeal was taken to this court, but for some reason or other the appeal was not prosecuted; and the cause was dismissed on the twenty-eighth of May, 1850. One year was allowed the appellants in which to bring a new suit, but this suit was not filed until the tenth of March, 1855.

But it is answered that at the time the case was dismissed by the Supreme Court the appellant, Mary Gillmore was a *feme covert*, and that the statute did not run against her.

It appears that she was married on the twentieth of October, 1849—only a few days after the trial of the cause in the District Court. She was a minor at the time, but her marriage removed her minority. Article 5299, Paschal's Digest, says, in case a verdict and judgment pass against the plaintiff, and he determine to appeal to the Supreme Court, and the Supreme Court should decide against him, he, the said plaintiff, shall have one year from the decision of the Supreme Court in which to bring a new action.

The dismissal of a cause by the Supreme Court cannot be regarded as a decision.

We are of opinion that when the first suit was dismissed by the Supreme Court the statute of limitation had then run from the eleventh of October, 1849, the date of the trial in the District Court. At that time both of the appellants were minors, but they soon after married. By their marriages they removed the disability of minority, and it is a settled principle of law that the operation of the statute cannot be defeated by tacking one disability upon another.

Mary Gilmore married on the twentieth of October, 1849; her sister, Agnes, married on the twelfth of September, 1850. We are then of opinion that this suit should have been brought before the twelfth of December, 1851.

This, then, brings us to the conclusion that the plea of *res judicata* was properly sustained by the court below. But the appellants, in an amended petition, set up that they were non-residents at the time the first suit was decided against them, and were therefore entitled to two years in which to bring their second action; and that before the expiration of that time the Legislature had granted them the land. This amended petition was demurred to, and, as we have already stated, the demurrer was sustained, in our judgment, properly.

This disposes of everything in this case which we deem it important to notice, and for the reasons given we affirm the judgment of the District Court.

AFFIRMED.